Thank you. Good afternoon, Council. We will begin today with Gelis v. BMW No. 24-2721. Mr. Dalton, do you wish to reserve some time? Yes, Your Honor. I reserve 5 minutes of rebuttal time. Granted. Thank you. Whenever you're ready. Good afternoon, Your Honors. My name is Chris Dalton. I'm with Buchanan Ingersoll & Rooney here in Newark, New Jersey. This is the second appeal by BMW of a contested fee award in the matter of Gelis v. BMW North America. The court is obviously quite familiar with the background, but I just want to go through a few facts to kind of set the stage for our discussion today. The case started with two separately filed class actions back in 2017. The plaintiffs consolidated their cases. BMW moved to dismiss the consolidated complaint. The district court granted in part, denied in part that motion to dismiss. Plaintiffs filed a second amended class action complaint. BMW answered that complaint and then discovery started. It took about a year to get to that point. We engaged in paper discovery, principally interrogatories and document requests. Didn't get to depositions or anything further. BMW produced about 750 documents, a lot of them consisting of vehicle owner's manuals. There were probably about a half dozen different types of vehicles and a number of model years involved. So we produced the owner's manuals, the service manuals, some advertising, the 20 or so plaintiff's sales and service records, as we noted in our papers. About 1,200 pages of documents, two bankrupt boxes for those of us old enough to remember the days of bankrupt boxes. Then after about four months, we turned to settlement. BMW had already issued a partial warranty extension for the part it issued. There was a timing chain which connects up the engine and turns the axle and it can break. So it wasn't as good as BMW wanted. So they had already offered a warranty extension. We turned to settlement. We engaged retired Judge Steve Orlovsky to assist us. And we were able in our first session to completely resolve the class relief, which consisted of out-of-pocket reimbursement for folks who had been injured, who had had to pay for the repair, and warranty extension going forward for a total of eight years from the vehicle starting service. The class was 575,000 vehicles. Over a million people were involved. But it took another two sessions to reach at least some measure of agreement on the attorney's fees, which is why we're here. BMW agreed to pay a low of $1.5 million, which it has already paid several years ago, and a high of $3.7 million, subject to the court to a disputed fee application before the district court. Mr. Dalton, we're working here off of, and we understand that there's an agreement. Yes, and in the first appeal, we focused the parties on that agreement. But when we look at that agreement, you're arguing that it's more of a fee shifting paradigm. But it also has a number of features that would seem to correlate with a constructive common fund. Home Depot, for example, talked about the constructive common fund doctrine, applying when parties agree to a cap on attorney's fees. Here, effectively, there seems like there was an agreement as to a cap. Why should we think about this as in a fee shifting paradigm outside of the statutory context and given the way this one is structured? Sure. Thank you. Thank you for the question and for the instructions. OK, so you pointed out we have a common fund paradigm where you look at a percentage of recovery to the class from the settlement fund. And we have the fee shifting paradigm where we look at the Lowe's star application. In those cases that talk about a constructive common fund, starting with this court's case back in 95, Henry G.M., the issue of a constructive common fund is what's the value of the relief to the class? So, you know, in the traditional common fund, it's here's $10 million, class counsel you and the class divvy that up subject to the district court's review. In a constructive common fund context, one would need to have some understanding of what the substantive relief to the class was. And as I mentioned, we had a BMW taking on an open ended risk, an open ended risk that of those 500, excuse me, of those million consumers, some of them are going to make claims and the claims of this case could be a couple of hundred dollars to thousands of dollars. We don't know. We didn't know when we sat down to discuss the fee application and we made all of these arguments. We didn't know what the value of that aspect of the settlement was going to be to the class. And then we have the warranty extension where BMW again took on an open ended risk of payment for warranty repairs. These are the unknown unknowns, like Don Rumsfeld said. But why does that take it outside of the common fund paradigm? I mean, in in Ray GM itself, we had a settlement agreement and it merely authorized attorneys fees as reasonable fees. It wasn't them, and we still treated it as a as a constructive common fund. Well, two things. This court in GM said in dicta, because the court did not reach the question of what fees should apply, the court suggested because the district court has the discretion of whether to apply the common fund paradigm or the fee shifting paradigm. This court suggested the concept of a constructive common fund. Now, remember, in Ray GM involved coupons. It was a coupon settlement. Five hundred dollars or a thousand dollars. In that case, perhaps there was some way of, you know, on return to the district court. So looking at this as the courts have called it a package deal and saying, OK, we know what the attorney's fees are. I think it was eight to nine and a half million dollars. And then the district court came up with a valuation of the relief to the class, which was somewhere between one point nine, eight billion and two point eighteen billion dollars. That's not our situation here. We don't have we don't have the denominator. Right. When you do a common fund rule in a percentage of relief and even in a constructive common fund, you're going to look at a percentage of relief and you take the attorney's fees on the top, the numerator, and you put the selling value on the bottom of the denominator. We don't have that here. Right. So that's why it takes it out of the common fund or the constructive common fund paradigm. I mean, I mean, basically what you're saying is if I understand what you're saying, you're saying common fund is a percentage of the recovery model. And if we don't if we don't have any evidence as to what the recovery is, then we can't use that model. And you're probably going to say that it was the other side's obligation to put in evidence of the amount of recovery, then argue about the amount of the percentage that would come their way. And so at bottom, are you basically saying not that a common fund couldn't ever apply here, but that on these facts, the way this case was argued when you don't know that denominator, as you say, we just we don't have the record to engage in meaningful common fund analysis. Precisely, judge, either common fund or constructive common fund. Right, right. But in any method that's based on percentage of recovery, if we don't have in the record what recovery is, then it becomes very hard to use a method based on percentage of recovery. Correct. And then we said that we need to revert to what is what our cases have always said. What is the basic measure of a reasonable attorney's case? It's the Lone Star. And in fact, that's what interestingly, you know, the Home Depot case, the judge at the court, the 11th Circuit there said. A fee provision, like ours, although it didn't have a cap, the 11th Circuit there, that case involved a known denominator. There was two point two five million dollars to the small banks. There's another settlement fund of twenty five million dollars to the big to the consumers. It had the denominator. But we're not really talking here about whether to use a percentage of the fund. We're we're we obviously have a Lone Star methodology that was applied by the district court. And we've acknowledged that where you have a, you know, a case where it's difficult to quantify that the recovery of the class that Lone Star may be appropriate. But isn't the question for us really whether Purdue, which obviously would apply to statutory fee shifting, should also be applying to fee shifting in the paradigm of a constructive common fund. If this is one. Sure, if this is a constructive common fund or argue it can't be a common fund, we don't have a common fund. The strictures of Purdue and its and its progeny should still apply to the Lone Star calculation, because, again, the idea is the Lone Star is the is the presumptive measure of what an attorney is entitled to as relief. And when you take the Lone Star as the district court did below and kind of conflate the Lone Star analysis with the Gunter factors, you end up double counting. And we point that out. So remember, you know, an attorney who's skilled and experienced, she's going to get a higher rate than somebody who isn't. And then Gunter says, well, you do good work because of your experience. You get a higher rate. So it's double counting. But but our, our case law recognizes that sometimes there can be multipliers of Lone Star. And so it seems that the range that that the parties are agreeing to kind of builds in at least some degree of multiplier of Lone Star. And so, you know, maybe delay other things, you know, abnormally high risk. You know, I mean, this is this is the trick with Lone Star. Billable rates is usually a thing by people who have a pretty good chance of getting paid and people who don't have a pretty good chance of getting paid. They rely on other things like contingency or percentage of recovery methods. So there's reasons that sometimes we don't that we we say, look, Lone Star tries to prevent double recovery in the hourly rate point. I think that's the point you're making, but that's not to say that Lone Star doesn't allow multipliers at times. And so the question for you is the district court apply to multiplier and what's wrong with that multiplier, especially on the standard of review that we have here. Well, the standard of review, Judge, if it's a question of law, which I believe this is, it's the wheel of newt to know that we're not supposed to say that anymore. The review and progeny all talk about exceptional circumstances, rare and unusual cases, and where you achieve extraordinary results or your Lone Star is too low because your rates are too low. This was a solid result for the class, which, you know, was effectuated by the efforts of both the Apprentice Council, Class Council and the University of North America. It was good, but it was not exceptional. And those are the instances where a Lone Star, excuse me, a Lone Star enhancement should apply. And that's what Purdue and City of Burlington and the other cases have all instructed. So I'm not saying that you can't afford an enhancement of a Lone Star calculation, but I'm saying that what I understand the case will be saying is when it's exceptional, when it's unusual, when it's an incredible result. Council, we've gone a few minutes beyond time, but I think we did want to give you some opportunity to address as well the reasonableness of the actual fees. Yes, and thank you very much for your indulgence there. We did challenge the reasonableness of the fees below and twice, pointing out various factors which we believe were excessive, and they are detailed in our briefs. One of the things that we were particularly concerned about, the first go around, we had 2,200 hours, I think, that were, sorry, 2,000 hours that were performed, 92% of them by partners at partner rates. And the result in that instance was an effective rate of about $1,800 per hour across all builders. The second go around in September of 2023, the Lone Star had increased to 2,875 hours, 80% of which were performed by partners, resulting in a $1,250 per hour rate across all timekeepers, whether partners to paralegals. And one of the things that the courts, especially in a 23 settlement, you want to look at the reasonableness and the fairness of the rates that are being imposed. And at that point, you know, $1,800 an hour, $1,200 an hour. Hell, I practice here in Newark. I don't know if anybody, maybe Mike Griffin sure gets that kind of money. But I can't say that $1,800 an hour standard in the field. As well, we don't think that the district court adequately scrutinized the hours spent on various and sundry tests. I noted previously that there were about 1,200 pages of documents, about 750 documents themselves. A lot of them had an easy gets, as the litigators say, but there were hundreds of hours spent on discovery. Let me ask you about that in particular. You referenced the 12,000 pages at the outset. But we have the district court here observing that these were highly technical documents and that the math, if I have it right, seems to work out to a couple minutes a page. If you're reviewing highly technical documents, how could we say it's clear error for the district court to find that reasonable? Sure. Well, the district court said that these were highly technical documents based upon, and I don't want to disparage class counsel, based upon class counsel's representations to what these were. She did not have in front of her the documents to which counsel were referring. And I did the calculations previously, but I think it was 250 hours. That's like one person sitting at eight, maybe 10 hours a day for a month reviewing documents. Even if there were a handful, a hundred highly technical documents, which I would say there probably weren't, does it take an individual sitting there 10 hours a day for a month to review those things? Well, it's one thing if that individual is on the low end of your billing tree. It's different if you're top canopy of your billing practice for your firm. Equally true, Judge. And, you know, if you have somebody at the low end, take that box. I mean, I remember 30 years ago when I was a baby lawyer, I was thrown into a big conference rooms with all these boxes, and I was billing at low rates. And that's why they put me in there. And I put a piece of post-it note on the ones that I thought the partner should look at. The partner that I was working for wasn't in that room doing that. And that's exactly right, Judge. You know, who is doing the review? What level of person is doing the review? When it becomes a technical document, when it becomes a difficult document to review, yeah, have a partner look at that. But you don't need a partner to look at it anymore. Thank you. I'm sure I've overstayed my welcome. Unless my colleagues have other questions at this point, we will be hearing back from you on rebuttal. Judge Phipps, Judge Roth. I'm good. Thank you. Thank you, Judge. Good afternoon. Bruce Nagel, Nagel Rice. I will start by flagging the fact that we, as we urged the trial court below in our first filings in December of 2020 to apply a constructive common fund approach, I will do that again today. But I would like to address first the question of whether or not the trial court abused its discretion in, A, applying the lodestar method and, B, whether there was any findings that were patently not supported by the record and patently erroneous. This panel, or should I say a panel of the Third Circuit, defined the remand to two limited issues. Number one, it stated that we want to, we are remanding so that the district court can provide information and more supportive factual findings to enable a reviewing court to determine if the hours were reasonable. And the second area that they remanded on is for the district court to provide additional reasoning regarding its decision to add a multiplier. Two very limited issues, and per footnote four in the first opinion, the appellate panel made clear that since BMW had never challenged the use of the lodestar approach, that it was not going to be the subject of the opinion. So on remand, the district court did exactly what it was asked to do. The first thing it did is it reviewed hundreds of pages of billing records, and it performed a very, very meticulous analysis, including eight different headings. And on each of those headings, it found the number of hours expended and the conclusion of law that those hours were reasonable in every single heading that was found. You know, to push back a little bit, there was 92 hours billed, I believe, for pre-pleading research. I think that for cases of complexity, that doesn't strike me as a problem. I'm speaking only for myself. But then there was 262 hours billed for drafting complaints, and the district court said at first blush that was excessive. And, you know, I guess there's three complaints in this case. The longest is about 100 pages. But 262 hours, I mean, even if you have 262 non-redundant pages, and I don't think you have that because I think the complaints build on each other a little bit. I mean, that's about an hour a page. And I just don't know that anyone bills out at an hour a page for drafting a complaint when you've already separately billed time for research. And a lot of these pages aren't that hard. It's citizenship of the parties or reciting the elements of various state law. I mean, 262 hours at very high rates strikes me as a very, very high number to produce a 103-page document. I respectfully disagree, and I disagree because this is not a run-of-the-mill case. This was an auto defect case where one of the firms involved, the attorney was a licensed mechanic, and he literally went and took apart the vehicle and meticulously documented for us to draft the complaint. That complaint is – Yeah, that's good. That's your 92 hours of pre-complaint. I don't have a problem with that. But when it comes down to drafting the complaint, and there's 262 hours drafting a complaint of your highest billed people, a mix of your highest people, and the district court says at first blush it's excessive, and the only reason it ever overcame that was some notion that this was highly technical. I read those complaints. They did have about three diagrams each. But once you understand what a timing belt or a timing chain is and once you understand what an auxiliary timing chain is, it's not too much hard about that. There's really not at the complaint stage when it's notice pleading. So my response really is threefold. A, I think that was entirely appropriate in terms of the sophisticated engineering issues. Number two, if this panel applies the constructive comment fund, which we are urging, that moots the issue that Your Honor has just raised. And the third issue is that the standard is that the district court must be given a broad leeway to make fact findings, and it's a very strict standard to reverse those fact findings, only where they are patently erroneous and not supported by the record. There must be great leeway given under the standards that are applied here, and if you apply the standard, the district court finding should be adopted. Let's look at another one. The district court said that it was reasonable for class counsel to expend 172 hours on negotiation and settlement, and that it was reasonable having multiple different partners at the same mediation because, you know, if they weren't doing the same work. But the district court didn't go on to make any findings that the work they were doing was actually different. How do we review that? Because there was also another finding that the efficiency that was employed by the team was excellent. The district court made a finding that 75% of the lead work was done by only one lawyer in each firm. That's significant. The district court complemented in three different areas the highly skilled and efficient methodology used by the three firms. Again, one firm was here on the engineering issue, and the other two firms, myself and Mr. Graven's firm, we led the legal side of it, and there's a finding in the record below in three different areas that that was a highly efficient, skilled approach to the case. So I would suggest that that should not be challenged and should not be looked at in any way, shape, or form. And once again, if our argument is accepted today that this really is a constructive common fund approach, then it moots the very issue of gradually looking at various breakdowns. Even if it is a constructive common fund, the district court here used a lodestar methodology, so we're looking at a lodestar methodology and whether an enhancement is appropriate where a lodestar methodology is used. And perhaps, and that's just the premise of your argument, a constructive common fund, but we still have a lodestar methodology being applied, right? Yes, that's the starting point, and we are asking, obviously, in the alternative, A, that that be affirmed, and B, that the constructive common fund approach be used, which would therefore moot and supplant the lodestar. So based upon the remand and footnote four in the remand, I mean, we really are put into an unusual argument appellate position, and that is, if your honors have posed an issue, should we apply constructive common fund? The answer is yes, you should, and we asked for that in the very first filing, which your honor has seen. I think we've cited docket number 81 or 87 in the first filing, and that argument has never been given up, including containing a footnote in the current appellate brief about the use of the constructive common fund. So that's been a theme throughout the entire litigation, starting in 2020. Now— But it's hard to say it's a theme of your arguments on appeal where it appears only in a footnote, and it's in proposed findings of fact with a reference to constructive common fund, but not even arguing that the agreement here has created one. And the argument seems to have been raised only as to the requested fees being reasonable with a percentage of recovery as a crosscheck on the lodestar methodology. So how is that pressing that there should be a different methodology or that there's something different about enhancements in the context of this sort of fund? And I will answer both questions, Judge Krause. First of all, in response to this panel's framing of three issues that were not focused on in the briefing, and there's a good reason, and that is because we were awarded the full amount and because of footnote four in the opinion. Now that the panel suggested that we address it, we, in our letter brief filed last week, specifically addressed why the constructive common fund should be applied here. So to the extent that it was raised, we did address it. And in that argument, we go through the numbers. And what's so important, what's so important, what makes it easy, respectfully, for this panel to apply the constructive common fund is we know that the Wawa court, which is the most recent Third Circuit opinion on this issue, they remanded to the district court, and they directed the district court to look at two key factors. What was the potential recovery under the Wawa settlement and what was actually paid out? That's really important. Because on remand from this panel, I'm sorry, from another panel of the Third Circuit, that's exactly what we had in the record. And BMW admitted on the remand during argument that there was approximately $3 million paid out and approximately $13 million in benefits for the extended warranty. And in addition, which they didn't really even address, but the district court did, there was a $27 million unrebutted expert report as to the value of the extended warranty into the future. So theoretically, we know now that there was hard dollars paid out for repairs and for reimbursement, so about $16 million. And we know that there is a finding, which was never rebutted with an expert or suggested to be rebutted on the first opinion, that there's another $27 million in the value to the warranty. So we have both elements that the Wawa court said should be looked at. Now, that gives us a very good first step. Let me ask you, when we're looking at Purdue, which clearly would constrain the ability to do an enhancement in a statutory fee shifting context. Let's assume this is a constructive common fund. The district court opted, as it was within its discretion, to use a lodestar methodology, largely with the party's blessings. And its goal is to ascertain reasonable attorney's fees. Correct. If Purdue looks at things like not double counting and factors that have already been subsumed into the lodestar in determining reasonable attorney's fees in a statutory fee shifting case, why shouldn't it apply equally if the lodestar methodology is being used in a constructive common fund case? Okay, so I'll again respectfully answer it in this fashion. I have no problem if general concepts of reasonableness, wherever they come from, are used in approaching a fee application. And quite frankly, in this circuit, that is precisely the language that's developed ever since Lindy, which was decided back in 73. So from Lindy forward, Lindy through Wawa, through the Dewey versus Volkswagen, in all of the cases that have addressed these issues, it's the same general issue. It doesn't matter what factors we apply from which particular case. What matters is, is the fee award fair? So that's number one. However, the reason why Purdue should not apply here is because Purdue established an extremely restrictive standard on multiplier. And that has yet to be adopted in this circuit or any other circuit. Every court that's addressed this, including Home Depot and every other case that we've been able to locate, has said that the Purdue case is limited to a statutory fee shifting issue. And the fact that it's an agreement of the parties, it's a fee agreement in a settlement agreement, that distinguishes Purdue. This would be the first district, this would be the first circuit in the country that would apply that very restrictive Purdue standard to a non-statutory fee shifting case. I get it, but isn't Purdue more about just the details of the Lodestar method as opposed to the source of using the Lodestar method? You can use the Lodestar method for a lot of scenarios. But Purdue seems to suggest, I think, a very reasonable thing, which is once we do Lodestar, we don't want to engage in double counting. That's reasonable. If you're going to do Lodestar where you itemize each item and each rate, you don't want to double count. And Purdue suggests, yeah, we don't want to double count through a multiplier. And a multiplier is, in essence, some degree of double counting. So if Purdue and yours more to the Lodestar method as opposed to being derived from any individual statute, which I guess would depend on the text of a statute, then, yeah, it strikes me as very reasonable to extend Purdue to any Lodestar method because it's more about Lodestar than individual statutory text. Except, remember, Purdue is in the context of a 1983 action. It was public funds that were at stake. That's a key issue in Purdue that does not apply in this case and does not apply in the 11th Circuit Home Depot case. It clearly applies to statutory fee shifting, and that extends into the private sector as well. Take Title VII, for example. The Purdue case specifically was going to reach into the taxpayer pockets in order to pay legal fees, and I believe that that was a major consideration in setting this very restrictive standard. So just to tease that out, if it's not reasonable to double count when it comes to taxpayers, somehow it is reasonable to double count when it's a non-taxpayer? I'm only responding to the prior question, which is should Purdue be limited? The answer is yes. I've given you respectfully the reason, and in the context of the joint arguments today, Purdue would not apply at all to a constructive common trust, and there's no case that suggests that it should. And in fact, why would the prior panel of the Third Circuit suggest to the district court, look at Home Depot when you decide whether or not to apply certain standards? It directed them, and what did the district court do? The district court followed the lead of the panel. It followed the direction, look at Home Depot, and Home Depot made the conclusion, arrived at it, that Purdue does not apply here. And there's no reason on this second appeal on the same case that we should be limited by this very restrictive standard. There is a reason, and I asked you the question about the reason, and you didn't respond. You pivoted, and the reason is this. Purdue makes double counting very, very hard to come by. It does that when the double counting is the result of the public fisc, but why is double counting, when it comes to public fisc, impermissible, but double counting is completely fine when it's not the public fisc? Either double counting is good or bad. What is it that makes double counting acceptable when it's not the public fisc? What makes it reasonable when it's not the public fisc, when you've already submitted itemized bills? For purpose of this argument, assuming arguendo that I accept that, assuming arguendo, it still doesn't answer the question that the district court's findings were not patently erroneous, and the district court findings have got to be given broad, affirming discretion. I'd like to hear your perspective on that, because 1,200 pages of document, that is not a document dump. 12,000 pages is nowhere close. Maybe if you said 12 terabytes, that's a document dump. 12,000 pages is single digits of banker boxes. I would say between four and six, and to spend 379 hours on four to six bankers boxes, that strikes me as just really, really high. 379 hours is weeks and weeks and weeks of time with four to six bankers boxes. We're dealing with a sophisticated engineering issue relating to a timing chain in an engine. These are very complicated issues. And 300 plus of my salaries to… I mean, is it really that complicated? Either the chain is too stiff or it has too much slack in it or it's not well aligned. Is there another issue there? Judge Phipps, I wish I could freeze-dry every one of my litigations into very simplistic approaches. I can't. We need to get a thorough view of everything that could have been defective or unsafe with regard to the timing chains. And 300 plus or minus hours to review complicated engineering manuals and drawings and other information relating to the structure of this engine, in my view, respectfully, is completely and totally within the realm of reason. And it's not just my view. It's the view of the district court judge who spent a year listening to arguments, looking at the findings of fact and conclusions of law that went on for hundreds of pages and made very well-reasoned conclusions. So it's not my view that that's reasonable. It was the district court's view, and there's absolutely no reason, even though you may think just on a cold reading of the record that that doesn't appear reasonable to you. It was the district court that had the full balance of the record. Just out of curiosity, did the district court look at the 12,000 pages themselves? Because if district court looked at them and said, oh, that blueprint, that schematic is just indecipherable, even for a person who's not a mechanic, maybe so. But did you put the 12,000 pages in front of them, or were they just taking your word on it and other people's word on it that they were highly technical? Because I'd credit the district court a lot more if they said, bring me all 12,000 pages. I want to see them in my chambers. I want to see them in camera. I just want to flip through them and get a sense of what they are, because some of this stuff just might be owner's manuals and other things like that, which that's a different level of technical sophistication. So what the district court had, it had the formula to get to that conclusion. It had both the summary of what we looked at. We described the kinds of documents, the schematics, the engineering, and it had the time records, which keyed in by date as to what we were looking at. And there was extensive oral argument when we appeared to argue the position. So the court had an elucidation on the record, which you have in the appendix. The court had hundreds of pages of time records, which tied into exactly and precisely what we're looking at. The time records even identified, hundreds of pages identified the document. It just doesn't say doc review all along. You'll see what was referred to in the time records. That was in the record. And those findings, respectfully, need to be given deference under the law and under the standards to be applied. And it would be, respectfully, it would be improper to make a cold review at this point and say, you know what, those 300 hours are just. So no review at all, no appellate review. Almost like the, I mean, look, I thought you had an argument on this a long time ago when you said the final arbiter will be the magistrate judge. I thought you were onto something with that argument. But that argument came and went, and so now we do get some review. I can see why you would want that. I could see why you would want to buy yourself an appellate waiver. That makes a lot of sense to me. But the argument came and went against you. And the argument I made two years ago is we did buy an appellate waiver. We did buy it. I get it. And quite frankly, it said final and binding, but the panel said, oh, you didn't use the word not appealable. Okay. Look, look. All of our errors. Nobody ever expected to be here once, let alone twice. I thought that was a good argument, but I wasn't on that panel. I thought you were onto something there. But the flip side is that now that you are, I don't think that we're toothless. I'm not suggesting in any way, shape, or form. I'm suggesting that even a very strict review at the appellate level respectfully does not result in a conclusion that the findings are patently erroneous. That is a really difficult standard to meet, and it has not been met on this record. And it's never been contested. It's not been met on this record. I don't believe in Mr. Dalton's brief, he raised the issue that you just did, Judge Phipps, which is look at the review of documents and look at whether or not the time records in any way identified what was looked at by way of mechanicals, by way of schematics, et cetera. This is an argument that's come up. It's never even been briefed. I mean, I would argue, theoretically, it's been waived because it wasn't briefed in this specificity. But in any event, I think if you apply it, and at the very, very worst, at the very worst, we would ask that, of course, Purdue not be applied. That the Constructive Common Fund be applied, which then would moot any of the issues regarding the Lodestar. And if you are going to stick with the Lodestar approach, and we're going to look at the multiplier issue, I would ask at the very worst, if you want to deduct, make a modest deduction of certain hours and multiply it out times the 1.75, that would end the saga. I never expected to be on appeal in this case. We negotiated this over a year with the help of a retired federal judge, Judge Orlovsky. He did a great job. It took us well over a year. Nobody ever expected, not once but twice now, we have to argue. So we would strongly urge that this panel apply what is the proper application, the proper standard, with knowledge that the trial court did not have at the first hearing when we filed in 2020. We now know what's been paid out. That is classic Common Fund approach. If we disagree with you, and we hold that Purdue does apply, at that point on the enhancement, do you lose? Or are you arguing in some way that the situation here would fit within one of the sort of exceptional situations that Purdue laid out? Yeah. So I'm going to give, again, two answers, Judge Krauss, respectfully. One, we don't lose because the work that was done here and the result is beyond exceptional. If you compare this to the two other major auto defect cases in the Third Circuit, which would be the GM case and the Dewey case, and by the way, Mr. Dalton didn't even mention the Dewey case in the supplemental briefing. If you compare our result to the GM case and the Dewey case, you'll see that we absolutely run the bell in this case. We are creating tens of millions of dollars in actual hard dollars to be paid out. We are creating tens of millions of dollars of extended warranty value. There's a $27 million extended warranty value that's never been challenged. That far exceeds anything you'll see ever done in the circuit. However, I will also say that if you do rule that Purdue applies to a lodestar approach, that will respectfully shut down substantially the plaintiff's class action bar in New Jersey and in the Third Circuit, because that is taking away the incentive to litigate major cases on a contingency basis. What you're doing is you're saying when you take a class action, even though you may not get paid like this case for now eight years, we filed in 2017, we only got partial payment, even though you may only get the lodestar and the lodestar is going to be challenged by every defendant under the sun, you will have litigated for many, many years and get a portion of your hourly rate. Why would any plaintiff's lawyer ever take a case? Why? You'd never do it. So I'm strongly urging you for the plaintiff's bar and for our firms and for anybody that does this work, there's an incentive in the fee law in the Third Circuit for a plaintiff's firm to litigate class actions, which have great value to our citizens. But the lodestar only comes into play when recovery is difficult to calculate, right? I mean, otherwise, you're going to be working with a percentage methodology. But where it's lodestar, I mean, didn't the Eleventh Circuit go exactly that route with Home Depot? Except we're overlooking Lyndi. We're overlooking what Lyndi did back in 73 and Lyndi too. They basically, that was a, Lyndi was not a common benefit. Lyndi shifted the paradigm in the early 70s because it was a lot of argument and a lot of backlash that plaintiff's lawyers were making too much money without doing work. So Lyndi went back to the lodestar but established four key elements to look at in lodestar enhancement, which, of course, we briefed. I mean, I'm happy to repeat it for you. It established the elements of the risk involved, the hours involved, the reasonable rates involved, and the result. Those are the four key things that they looked at. Lyndi has never, ever been challenged. For 50 years, it hasn't been challenged. But for now, that long predates Purdue. And what do you do with the reasoning of the Eleventh Circuit? It points out that Purdue's reasoning turns on largely on the point that most of the factors used to justify enhancement are already subsumed in the lodestar. So it would result in a windfall to count them again with a multiplier. This reasoning makes it just as unreasonable to double count in a contractual fee-shifting case as it is in a statutory fee-shifting case. Well, I would suggest that that dicta in Home Depot should not apply in the case that we have here. I would suggest that if you adopt that view of that portion of the Home Depot opinion, I would suggest to you that that will, in effect, overturn both Lyndi and GM and every other case that's come down. There's been no case that's come down in this circuit which in any way vacated those key elements to look at in determining a lodestar enhancement. If we shut that down, that's going to be a major, major change and will have major effects in the Third Circuit. All the practitioners in our circuit will have handcuffs, and it will be a huge disincentive. I mean, I understand that the sky is falling argument that you're saying, but, I mean, at one level, I don't know that Purdue and Lyndi don't have some partial recognition. If Purdue stands a partial ability to work together, if Purdue stands for the proposition that we won't double count, there might be some aspects where a multiplier would be acceptable if there's going to be a long delay to payment or something else like this. Because that might not be accounted for in just pure risk or pure hours or pure rates or pure results. And so there could be scenarios where even if we look at an inflated rate and in the allocation of hours, there may still be reason for some multiplier. But I think that it's hard to ignore Purdue in saying that, hey, look, the lodestar already builds a lot of that into account. Well, again, Your Honor, if you do that, then you're ignoring the four key factors of Lyndi, and I don't think that that's the direction of the court. Lyndi made clear number of hours spent is in the record, reasonable hourly rate, contingent nature of success, and quality of counsel's work. I mean, these issues are defined and have been reiterated over and over and over again for 50 years. Those three factors set the lodestar. The second two factors are the enhancements. Yes. So, again, if certain of those Lyndi factors set the lodestar and then we look at the other factors for enhancement, we still are in a position where plaintiff's counsel and class action will have a disincentive ever to take a case if, in fact, we apply the Purdue limitations on lodestar enhancement. And we're strenuously arguing today that you adopt what you sui sponte suggestively brief, which is a constructive common fund approach, which would moot any of these issues. And that amount, based upon the admitted position of BMW, is a small percentage. It's either 8.5% or even less if we gross it up to over $40 million, or it's no more than 20% if we leave it even less with the $27 million, which was undisputed. So no matter which way you cut the cake, as the court below said, it's still under the one-third, which would be normal in a case like this. Okay, thank you, Mr. Nagle. I think we understand the argument. Judge Roth, Judge Phipps, any further questions? No further. Thank you. Okay. Sorry, did I stand before you? We hear you, Mr. Dalton. Oh, okay, perfect. Judge, I'd just like to take a couple of minutes to go over some of the points that were made in the last council's argument, taking them backwards as I might. Council refers to Lindy and its progeny. I would respectfully suggest that those cases have been, at least implicitly, overruled by the Supreme Court's decisions in the city of Burlington, in Purdue, even in Delaware Valley. Frankly, he wrote against El Capri from this court to basically say upward adjustment of the quality of representation is permissible only in rare and exceptional circumstances. And while I agree that this was a good result for the class, I do not think we knocked it out of the park. It wasn't the home run that they met on base. It was a good result. Okay. Class counsel appear to argue, if I understood, well, one of the arguments, Judge Phipps, you noted the sky is falling. Class counsel argues that without the ability to apply for a common fund percentage of recovery, nobody would take these cases. I've been practicing in the consumer class action, consumer protection world for 25 years, and Mr. Nagle and Mr. Grafman have as well. And every time I have one of these cases, particularly the New Jersey Consumer Fraud Act, I will see the statements, the Consumer Fraud Act is liberal. It is a socially beneficial statute to be liberally construed, and we have this fee shifting provision, 56.8-19, to attract competent counsel. Now, separately, this is a contractual settlement, right? But if this had gone to trial, and if I had lost at trial, there would be a fee application. And what would the basis of that fee application be? It would be 56.8-19, or the equivalent of pretty much every other state, about 45 of them, gives the prevailing party a fee shifter. So class counsel or individual competent counsel are going to continue, as in the Title VII context, continue to be incentivized and appropriately awarded reasonable attorney fees if they prevail. Mr. Dalton, we have a number of cases where we've said, in doing a cross-check to the Lodestar methodology, that you can take account of various factors, including enhancements. Obviously, we're not dealing here with the primary question of looking at just a cross-check, but rather, which is an appropriate basis. But let me ask you, would we need to overturn our own precedent that says you take account of enhancements in doing a cross-check to see about the reasonableness of a percentage of the fund approach? If we're going to say that Purdue applies and accepted exceptional circumstances precludes consideration of an enhancement outside of the cross-check? No, Judge, I don't think you would necessarily be looking to overrule prior precedent. I think the question is clarification. You know, we know that in the classic common fund situation, the court will do a Lodestar cross-check to make sure that the percentage of common fund is not inappropriately overpaying counsel, becoming a windfall. And in that instance, it's because you want to make sure that the counsel award is not taking away from the relief to the class. In the Lodestar, if we have a constructive common fund where we use the Lodestar, it's kind of the reverse. It is saying, does the Lodestar amount inappropriately or appropriately award class counsel? Let's think about a situation where we have a settlement that's valued at a million dollars and class counsel is paid $3 million under a Lodestar calculation. That's a question that you want to look at and go, well, wait, it's three times what the class is getting, even though it's a Lodestar. Should we really be giving that? And maybe you use a Lodestar multiplier or a disenhancement to say they spent too much, you know, whatever, whatever reason. You spend too much time, you use the too high a dollar, whatever the court, the court just needs to be sure that whatever methodology it's choosing to use is a reasonable fee appropriately. So just just kind of on the theme of reasonable fee, let's just say this was a constructive trust. And let's just say that the total settlement valued it, I don't know, between 40 and 50 million dollars. I'm just guessing that's that's somewhere in the range, maybe high 40s. I think I saw 47 at some point in time. I don't know if that's right. But we're looking at if I'm doing the math right, we're looking at, like, a common fund percentage of under 10%. Is that, in your view, an unreasonably high common fund percentage? So unpacking that, a couple of points. One, you estimated a number. We have heard so many different numbers bandied about as to the value of this settlement. I don't know where Judge Walter came up with 27 million. Now we're being told it's 20 million because BMW paid some money. We think that there's some double, some incorrect math there, whatever. And you just noted it's, you know, maybe it's 40, maybe it's 60. OK, let's say we had a low start calculation that comes out to 10% of the common fund. That's a great crosscheck. That's a great crosscheck. But if we did that as a crosscheck, that would suggest that the crosscheck of 10% of 47 million is 4.7 million. And so an award of 3.7 million is comfortably within a 10% fee. I mean, I mean, I don't I don't know. You know, I don't know all the details, especially, you know, the longer the longer that, you know, I'm not engaged actively in the practice of law. I don't know the that the percentages that work at the common fund level. But 10%, I mean, every now and then it's single digit percentage if you're talking hundreds of millions of dollars recovery. But I don't, is 10% considered unreasonable? I would agree that 10% is probably not unreasonable. But here's the question. Here's the question, Judge. What's the load star? The load star is what the critical factor is. If we're using a load star calculation, you use the load star. Here the load star, if I recall, was probably about $2 million a week. I know, but I guess I guess what I'm saying is, I'm just trying to, I'm just trying to piggyback on Judge Krause's question. It seems to cross checking goes both ways. If you want to use the load start a cross check a common fund, it seems that you could use a common fund to check a cross check a load star. That that that that's the only point I'm getting at is, is it? I don't know that it's a one way push. And if it's a two way push, then it strikes me that if we're looking at 47 million and 10%, then then this one might fall into a realm of closer to reasonable. Now, if you told me that 10% is way too high, and the number should really just be 5%, then 4.7 becomes a lot closer, like 2.2, 2.3. And then you say, hey, look, you know, still the cross check doesn't work. It's still high. But that, but, you know, there hasn't been just this is why I think there's reason to think that the constructive trust issue hasn't been raised. Because the big issue in those cases is what the percentage should be. And then you do a lot of metrics for in this case, the percentage was X. In this case, percentage was Y. You know, if I understand if I understand that the dynamics of the litigation. Well, I think you're right and I'm pretty sure reading these cases again. I think it's fair to do to take the load star. And if you have a common fund, or if you have a constructive common fund that you can determine here, I posit that we do not because there's just numbers all over the place. If you have a constructive common fund against which you can say, you know, we have a $2 million, I apologize, you have a $4.7 million load star, load star, no enhancement, nothing else. And we have a $47 million common fund. If you can make that determination, then you can say 10%. Yeah, that seems right. You flip it around, if you have a load star, that's two or three times what the class gets, the district court should question whether it's an appropriate reasonable attorney's fee. So I'm not saying you can't cross check. Yes, you can cross check, but you can't use that cross check, as the district court did here, to come up with a multiplier. The district court muddy things and confused some of the issues, I think, below. Okay, we've, we've gone a bit over time. So, thank both counsel for your very helpful arguments today and for your supplemental briefing. And we will take this case under advisement.